Filed 8/26/22  In re J.B. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re J.B., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>A.H. et al.,<br><br>    Defendant and Appellant. | D080107<br><br>(Super. Ct. No. J519899) |

APPEAL from an order of the Superior Court of San Diego County, Michael P. Pulos, Judge. Affirmed in part, conditionally reversed in part with directions.

Michelle D. Peña, under appointment by the Court of Appeal, for Defendant and Appellant, A.H.

Paul A. Swiller, under appointment by the Court of Appeal, for Defendant and Appellant, M.B.

Claudia Silva, acting County Counsel, Caitlin E. Rae, Chief Deputy, and Eliza Molk, Senior Deputy counsel, for Plaintiff and Respondent.

A.H. (Mother) and M.B. (Father) appeal a juvenile court order terminating their parental rights for minor J.B. They contend the court erred in finding that the beneficial parent-child relationship exception did not apply to prevent termination of their rights under Welfare and Institutions Code, section 366.26, subdivision (c)(1)(B)(i).[1] Mother further contends the juvenile court erred in denying her petition under section 388 to lift supervised visitation, which would apply if the court did not terminate her parental rights. Both parents also contend that the juvenile improperly found that the Indian Child Welfare Act (ICWA) did not apply because the Agency and the court failed to meet the burden of initial inquiry by not asking readily available relatives about their ancestry.

We conclude that the juvenile court did not abuse its discretion in determining that the parents' relationship with J.B. did not outweigh the benefits of adoption. We also conclude that the court did not err in denying Mother's section 388 petition for expanded visitation. However, because we agree that the Agency and the court did not meet the burden of initial inquiry, we conditionally reverse the order with directions for the court to comply with the inquiry provisions of ICWA and section 224.2. In all other respects, we affirm the order.

BACKGROUND

A.    *Incidents Precipitating Detention.*

Mother and Father are the parents of J.B. They were in a romantic relationship for two years before J.B. was born.

---

[1]    Further statutory references are to the Welfare and Institutions Code unless otherwise stated.

In May 2018, while Mother was pregnant with J.B., the parents engaged in an argument and Mother ran outside for some air. Father ran after her, grabbed her right arm and her hair, and spun her around. She fell and sustained lacerations. She was taken to the hospital for monitoring. Father was arrested and the criminal court issued a "no negative contact" domestic violence restraining order against Father. Although Mother initially moved out of their shared home, she told a judge that Father did not touch her and she moved back in with Father. The criminal court ordered Father to attend a 52-weeek domestic violence program.

Three months later, Father violated the terms of the restraining order when he threw a car seat through a bedroom window of their home while Mother was feeding newborn J.B. nearby.[2] Father was under the influence at the time of the incident. Mother was smoking marijuana and drinking while breastfeeding J.B. A responding officer believed that if Mother and J.B. were in the bedroom when the window shattered, it could have caused Mother great bodily injury and the potential death of newborn J.B. Mother, however, did not want to pursue prosecution or cooperate as a witness.

Mother reported that Father became "aggressive and angry" when he drank "hard liquor." He did not allow her to socialize with friends or other family members and took her phone away for periods of time to prevent her from talking to her friends. Mother lived with Father and his mother (paternal grandmother). Mother said they were not at the home during the day when she was caring for J.B.

Mother agreed to a safety plan in October 2018 saying that she would take J.B. to her mother's home (maternal grandmother) if Father showed

_____

[2] Mother's accounts varied about whether she was in another room or in the bedroom where the window was broken.

3

signs of an attitude or behavior change or if he was under the influence. She agreed to contact law enforcement if she feared for J.B.'s safety. Father agreed not to drink alcohol in the home.

After Mother agreed to stay with maternal grandmother, the criminal court imposed another domestic violence protective order prohibiting any contact between Mother and Father except to safely exchange the child for visitation. Less than 10 days later, Mother returned to Father's home.

The parents refused multiple requests for drug testing. Mother admitted that she used marijuana while she cared for and breastfed J.B., but she agreed not to drink alcohol.

The Agency was concerned that Mother returned to live with Father despite the protective order and that Mother intended to ask the criminal court to drop the protective order. The Agency was also concerned about the parents' use of marijuana and alcohol while they cared for J.B.

The Agency filed a petition in November 2018 alleging that J.B. was a child within the jurisdiction of the juvenile court under section 300, subdivision (b) because he was at substantial risk of suffering serious physical harm due to his exposure to violent confrontations between the parents and the parents' inability to provide care due to their substance abuse. The parents disagreed with the findings from the Agency's investigation and denied any physical altercations. The juvenile court issued a protective custody warrant and ordered J.B. detained out of the home

B.   *Six-Month Review Period.*

In the initial reporting period, Mother progressed from supervised visitation to short, structured unsupervised visits during the week. Mother interacted appropriately with J.B. during her visits.

4

Mother participated in the drug dependency court, but was in poor to fair compliance with its requirements. Mother enrolled in a domestic violence group and demonstrated that she learned about aspects of abuse, including emotional abuse. She believed she only suffered emotional abuse based on Father's comments to her.

Mother and Father continued to reside together with paternal grandmother. When the social worker informed her that she could not have overnight visits while she lived with Father, Mother said she might move into the home of maternal grandmother.

Father brought toys and food to his visits with J.B. and interacted with him appropriately. He fed and changed J.B. as needed. Father, however, canceled several visits due to work or illness.

Although Father participated in his domestic violence program, he did not demonstrate an ability to use the tools he learned. He continued to engage in arguments in the home and sent the social worker profane and hostile text messages.

J.B. did well in out-of-home care. He also spent time at a respite foster home and adjusted well to new people.

At the six-month review hearing in June 2019, the Agency reported it had reverted Mother's visits to supervised because Mother was taking J.B. to see Father during her visits and she tested positive for alcohol use on several occasions. Mother's counsel set the matter for trial on the issue of supervised visits.

In a September 2019 addendum report, Mother reported that she had maintained her sobriety since June 2019. However, a photo on Mother's social media account showed her at a restaurant with a glass of beer. Mother's drug tests were negative.

5

Mother's domestic violence facilitator noted that Mother lacked insight regarding the effects of domestic violence because she continued to live with Father despite expressing a desire to separate from him. Photos from the parents' social media accounts showed that they visited with J.B. jointly at Father's place of employment even though Father was not allowed to be present during unsupervised visits.

The court continued the contested hearing for the Agency to obtain additional information regarding the parents' progress and insight into the protective issues.

Thereafter, Mother completed a substance abuse treatment program and complied with drug testing requests. She tested negative for all substances. She also completed a parenting class. Mother attended a domestic violence group, but did not acknowledge domestic violence in her relationship with Father saying that she only experienced emotional abuse.

Father tested positive for THC, indicating recent marijuana use. Although Father completed a 52-week domestic violence treatment program, he had limited insight. His provider recommended conjoint therapy between Father and J.B. as well as between the parents. The Agency remained concerned that the parents chose to live together despite domestic violence being the primary protective issue for this case. They continued to lack insight about domestic violence dynamics in their relationship despite their participation in domestic violence programs.

At the continued hearing in October 2019, the court ordered Mother to have short, structured, unsupervised visits, which were separate from Father. The court added conjoint therapy to the case plans to address domestic violence, based on the parties' agreement to participate.

6

*C.    12-Month Review Period.*

The parents had difficulty arranging conjoint therapy due to scheduling conflicts for both the parents and the provider.  The Agency referred the parents to another provider, but they did not engage in conjoint therapy.

Father resisted random drug tests citing his work schedule.  He tested positive for cocaine in October 2019.

Mother temporarily left the home she shared with Father and paternal grandmother in mid-November 2019 after an incident in which paternal grandmother drank to excess and threw food at Mother.  Mother said she went to maternal grandmother's home to cool off, but Mother continued to live in Father's home.  She acknowledged that people drinking alcohol in front of her was a trigger.  But she stated, "This is how I want to live my life and I cannot deny that [Father] is [J.B.]'s dad."

The parents set the matter for trial at the scheduled 12-month review hearing in January 2020.  The matter was continued several times due to the pandemic and to allow the Agency to reassess service recommendations for the parents.

Mother moved out of Father's home in January or February 2020 to show the Agency she was not living with him.  However, they continued their relationship.  Father tracked her whereabouts on his phone.

In March 2020, local police received a report that Father was banging on the door and yelling at maternal stepgrandfather's residence, where Mother was staying.  A security guard told Father to leave.  Mother reported that they broke up in March.  Father later said they broke up after being intimate in mid-May 2020.

By June 2020, Mother reportedly removed the ability of Father to track her phone and said she would walk away from Father if she saw him in

public. When a social worker noticed she was wearing an engagement ring, Mother admitted she was engaged to Father and they had planned to marry the following year. She appeared irritated at the social workers questions and asked why the worker wanted to know everything.

When the contested 12-month hearing proceeded in July 2020, the court found Mother's progress was adequate and Father's progress was minimal. The court continued reunification services for an additional six months.

D. *18-Month Review Period.*

Mother was granted overnight visits with J.B. in mid-July 2020. By September 2020, however, the Agency was concerned that Mother was not forthcoming about where these visits occurred. The parents went out of town during the same period of time in September. Although they told the social worker that they were going to different locations, their social media accounts showed photographs of the parents together and contained comments from Mother expressing her love and commitment to Father, including a statement suggesting they were married. J.B.'s caregiver believed Mother was living with Father again. Mother said she split her time between maternal grandmother and maternal stepgrandfather. Both grandparents said they would not see Mother for days and said she would also stay with a friend. When pressed to confirm her living situation, Mother was evasive. The Agency reverted Mother's visits to supervised visits at the end of October 2020.

Mother did not comply with requests for random drug tests between August and November 2020. Father similarly did not comply with requests for random drug testing even though the Agency arranged for mobile testing at his home.

8

Mother enrolled in a virtual co-parenting class, but did not follow through for several months, citing problems with internet connectivity. Father stated he was unable to attend co-parenting classes due to his work schedule.

At the scheduled 18-month review hearing in November 2020, the parents requested a trial on the issue of placement and services. The juvenile court made a prima facie finding on the Agency's section 388 request to change Mother's visits to supervised.

A January 2021 addendum report indicated that J.B. continued to do well and was very attached to his foster parent. He was aware of who his mother is and asked to see pictures of her. Mother and J.B. were excited to see one another for visits. The Agency recommended termination of reunification services and the parents' counsel confirmed a trial date. The court continued the contested hearing because the assigned social worker was unavailable.

In March 2021, the Agency reported that Mother did not comply with on-demand drug testing on two occasions. She had not completed the co-parenting program, but intended to start soon. Father was nearly finished with the co-parenting program. Mother completed her domestic violence group, but continued her relationship with Father. The Agency was concerned that she had not gained insight to protect herself and J.B. from an unhealthy relationship. Father did not provide on-demand drug tests even when he said he would comply. He did complete a domestic violence group as required by his probation and participated in parenting and co-parenting classes. The Agency continued to recommend termination of services and the setting of permanency planning hearing.

The court again continued the scheduled 18-month review hearing when the parents agreed to undergo hair follicle testing to show sobriety over the prior months. They also agreed to permit the agency to assess their respective homes for placement.

Mother's hair follicle sample tested positive for cannabinoids and THC. Mother said she relapsed on marijuana due to insomnia. She said she preferred marijuana to melatonin, which made her "zoned out." Father's hair follicle test was positive for multiple substances including cocaine, cannabinoids. and THC.

Mother rescheduled her home visit twice before saying she moved back in with Father and that they resumed their relationship. She said they wanted to take steps to reunify as a whole family. She said that if J.B. could not be placed with them, she would move back in with maternal stepgrandfather.

On April 20, 2021, the court considered the Agency's section 388 petition to revert Mother's visits to supervised along with the combined contested 18- and 24-month reviews. The court heard testimony from the social worker and considered the Agency's reports. The social worker understood the parents were living together. The worker viewed the home in early April and had no concerns regarding the residence. The worker had no concerns about Mother's supervised visits with J.B. However, the social worker was concerned about returning J.B. to Mother because the parents were living together and both parents continued to use substances. The worker thought it would have been helpful if the parents had participated in conjoint therapy to address concerns in the relationship and to avoid future domestic violence. The worker stated that the Agency did not have a

concurrent home for J.B. at the time and that resource family approval (RFA) evaluations were still ongoing for several relatives.[3]

Before making its ruling, the court commented that "time is the biggest enemy of this case." The court looked not only at the parents' journey, but also the child's journey to see if those intersected in a healthy, consistent and meaningful way to determine if there was a substantial probability of returning the child to his parents.

The court gave Mother credit for completing a domestic violence course, but noted that it did not have clear evidence that Mother was applying what she learned in that course when she renewed her relationship with Father and began living with him again.

The court observed that it only had one hair follicle test for Mother and did not have other evidence of consistent sobriety despite repeated requests for testing. For Father, there was one hair follicle test showing he used or was exposed to cocaine in the past 90 days.

The court observed that the parents' visits with J.B. were good. However, J.B.'s behavior changed in early April 2021. He was screaming at bedtime and throwing toys. The court expressed concern that the parents did not follow-up or ask the caregiver about this behavior. The court was also concerned about whether Mother could handle this behavior given that she reported taking marijuana on a daily basis for insomnia. There was a concern about her ability to safely care for J.B. while she was under the influence.

---

[3]    The Agency interviewed many relatives about possible placement and several submitted applications for RFA approval. RFA approvals were not ultimately granted for J.B.'s relatives for a variety of reasons.

11

The court determined that the Agency provided reasonable services and that the parents made some progress with their case plan. However, there was no additional evidence of sobriety and no showing of insight regarding either domestic violence or an ability to understand J.B.'s recent negative behavioral changes when the parents renewed their relationship. The court, therefore, terminated reunification services.[4]

The court also granted the Agency's section 388 petition to change Mother's visits to supervised. The court set a permanency hearing for August 2021.

E.     *Permanency Planning Period.*

Maternal stepgrandfather took Mother to an emergency department in June 2021 due to a huge bite mark that punctured her skin after an incident between Mother and Father. The incident was not reported to law enforcement. Sometime in late June 2021, Mother moved out of Father's residence and into stepgrandfather's home.

J.B. was placed in a new home in early August 2021 with a family who was willing to adopt him. J.B. was familiar with the family and had an attachment to them because they had provided respite care for him since 2019. The caregiver reported that she has "relationships" with Mother and stepgrandfather. She commented that they are part of the family and she wanted J.B. to continue a relationship with his family if it was in his best interests.

---

[4]     Mother filed a notice of intention to file a petition for a writ of mandate to challenge this ruling. However, we dismissed the matter after Mother's counsel indicated that a petition for writ of mandate would not be filed under California Rules of Court, rule 8.452 because there were no viable issues for writ review.

12

The permanency planning hearing pursuant to section 366.26, which was initially scheduled for August 2021, was continued twice at the Agency's request to allow the Agency additional time to find an appropriate permanent placement and to assess relative applications for RFA.

According to an addendum report in November 2021, J.B. had adjusted well to his new home and he had formed attachments to the caregivers and their biological son. He enjoyed visits with his parents during the reporting period and engaged with them. However, he was able to separate at the end of each visit without distress. He did not ask about the parents outside of visits. He did ask about his previous caregiver with whom he spent the majority of his life.

Over the following months, J.B. engaged with the parents during visits and appeared excited to see them upon arrival. He continued to easily separate at the end of visits. He was upset when one visit did not occur in December 2021, but he calmed down when the visitation monitor played music during the car ride back from the visit. At another visit, he repeatedly asked to see his previous caregiver. He was upset at the end of a visit because he wanted to continue playing. However, he resolved his emotions and walked away from the visit without distress.

In early January 2022, when he was being transported back from a visit he said he wanted to be with "his family," whom he identified as his caregivers. J.B. referred to his caregivers as "Mommy" and "Daddy" and to their son as his "brother." A social worker observed J.B. run into the caregivers' arms after visits with the parents. His teachers reported that he often asked for his caregiver, who worked at the school, when he returned from visiting the parents.

The Agency recognized that J.B. had a relationship with his parents. However, given that J.B. had spent all but the first three months of his life in foster care, the Agency did not believe this relationship was "secure enough" to outweigh the benefits of permanency that would be gained through adoption. The Agency did not believe it was in his best interests to withhold permanency from him any longer.

The parents requested a contested hearing on the issue of termination of parental rights. At a pretrial settlement conference in February 2022, the parents' counsel confirmed the contested trial on the issue of the parent/child bond and adoptability.

Mother submitted a section 388 petition requesting a change of order terminating her services to place J.B. with her or to expand her visits to unsupervised visits. In support of her request, she presented evidence that she had completed the co-parenting class, obtained employment as a caregiver for a young child, and attended narcotics anonymous meetings. She also submitted a report from Elizabeth Stanton, Psy.D., a psychologist who reviewed the case reports and observed two visits between Mother and J.B. Dr. Stanton opined that Mother and J.B. had a secure attachment pattern.

F.  *Combined Contested 366.26 and 388 Hearing.*

The contested hearing proceeded on March 3, 2022. Dr. Stanton testified about her observations from two visits between J.B. and Mother. She believed there was a secure attachment between Mother and J.B. because he sought her out for assistance with snacks and looked to her for guidance to navigate play structures. J.B. had no negative reaction to separating from Mother, which Dr. Stanton thought indicated an expectation that she would return. She did not believe he was apathetic to her because

he looked for her as they parked for the visit and grabbed her hand when he got out of the car.

On cross-examination, Dr. Stanton agreed that the child did not verbally express an expectation to see Mother again. Dr. Stanton did not believe J.B.'s change in behavior after the visits indicated a lack of attachment, but rather was typical of a child in the midst of conflict.

Dr. Stanton agreed that a child can have more than one secure attachment, which is great for a child. She believed it would benefit J.B. to remain in contact with the biological family as well as the caregiving family. She described that as a win-win situation.

Dr. Stanton also agreed that children benefit from stability over time in their placement. She could not say that a secure attachment is more important than the benefit of a long-term stable home. She thought a combination of the two would be beneficial.

She was not asked to opine about whether adoption or legal guardianship should be the permanent plan. Nor was she able to say whether J.B. should return to Mother's care. She could not say there would be immediate detriment to J.B. if the secure attachment with Mother was broken.

Dr. Stanton did not interview or talk to J.B.'s caregiver in preparing her report. She did not believe information from the caregiver would necessarily be helpful to analyze a bond between J.B. and Mother. She did not know the level of attachment J.B. had formed with the caregiver.

Dr. Stanton agreed that trust and stability is a benefit of an adoptive home. She could not say whether that benefit outweighed any detriment from termination of parental rights.

15

Mother testified on her own behalf. She acknowledged that the case was opened due to domestic violence and drug abuse. She said that she learned in her domestic violence course about the cycle of violence and red flags. She made a safety plan and identified as a victim of domestic violence. She said she learned in her drug treatment program about how to stay away from users and how to cope by going outside and getting exercise. Her relapse prevention plan includes going to therapy and counseling, attending narcotics anonymous meetings, and seeking out people for guidance. She was seeing a psychiatrist for anxiety and depression and was consistently taking medication.

Mother was living with paternal stepgrandfather and believed J.B. could live there. However, the stepgrandfather's RFA application was denied based on his criminal and child welfare history.

Mother denied having contact with Father in the past six months and said she had no intention of renewing a romantic relationship with Father. Mother acknowledged that there was emotional abuse and control in her relationship with Father.

The social worker testified that Mother typically visited J.B. along with maternal stepgrandfather. Mother interacted appropriately with J.B. during visits. She was attentive, affectionate, and allowed him to lead in play. He responded sometimes when Mother redirected him. If he had a problem, Mother would go to him. He did not seek her out.

When the social worker transported J.B. to visits with Mother, he did not express excitement to see Mother or the stepgrandfather and he did not spontaneously talk about Mother. When asked, he said he liked the visits. On one occasion, the child said he wanted to go see his prior caregiver, but

16

when they arrived at Play City for the visit, he became more animated. J.B. separated easily at the end of visits and showed no distress at all.

J.B. talked about the caregivers all the time. He referred to them as "Mommy" and "Daddy" and said he wants to live with them. After visits, his teacher noticed that he was standoffish, sucked his thumb, and asked for his caregiver.

The caregivers reported that when there were no visits with Mother, J.B. seemed happy and did not appear distressed about not seeing Mother.

According to the social worker, J.B. is a friendly, social, and energetic boy. His caregivers want to adopt him.

After considering the evidence and the reports, the court denied Mother's 388 petition finding it was not in J.B.'s best interest to change J.B.'s placement or to lift supervision from her visits.

The court found by clear and convincing evidence that it was likely that J.B. would be adopted if parental rights were terminated and none of the exceptions under section 366.26, subdivision (c)(1) existed, including the beneficial parent-child relationship. The court, therefore, terminated all parental rights as to both Mother and Father and determined that adoption was the appropriate permanent plan. The court set the post-permanency planning hearing for August 31, 2022.

DISCUSSION

I. Beneficial Parent-Child Exception

The parents contend the court erred in determining that the beneficial parent-child exception did not apply to prevent termination of their parental rights. They contend there was substantial evidence of a beneficial relationship and that the court abused its discretion in determining that the

17

benefits of that relationship did not outweigh the detriment J.B. would suffer from terminating the relationship.

A.    *General Legal Principles.*

"The sole purpose of the section 366.26 hearing is to select and implement a permanent plan for the child after reunification efforts have failed." (*In re J.D.* (2021) 70 Cal.App.5th 833, 851-852.)  At this hearing "the juvenile court has three options:  (1) to terminate parental rights and order adoption as a long-term plan; (2) to appoint a legal guardian for the dependent child; or (3) to order the child be placed in long-term foster care. [Citation.]  Adoption is the preferred plan and, absent an enumerated exception, the juvenile court is required to select adoption as the permanent plan.  [Citation.]  The burden falls to the parent to show that the termination of parental rights would be detrimental to the child under one of the exceptions." (*In re Fernando M.* (2006) 138 Cal.App.4th 529, 534.)

One of the exceptions to the preference for adoption is the parental-benefit exception.  (§ 366.26, subd. (c)(1)(B)(i).)  A parent asserting this exception must show by a preponderance of the evidence:  (1) regular visitation and contact with the child; (2) the child has a substantial, positive, emotional attachment to the parent; and (3) terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home.  (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).)

The first element, visitation, is "straightforward," requiring that the " 'parents visit consistently,' taking into account 'the extent permitted by court orders.' " (*Caden C., supra,* 11 Cal.5th at p. 632.)  The second element focuses on the child and is determined by taking into consideration factors such as " '[t]he age of the child, the portion of the child's life spent in the

18

parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs.' " (*Ibid.*, citing *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).) For the third element, "the court must decide whether it would be harmful to the child to sever the relationship and choose adoption. [Citations.] Because terminating parental rights eliminates any legal basis for the parent or child to maintain the relationship, courts must assume that terminating parental rights terminates the relationship." (*Caden C.*, at p. 633.) When the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Id.* at p. 634.)

When deciding whether terminating parental rights would be detrimental to the child, the court does not compare the attributes of the parent against those of the custodial caregiver. (*Caden C.*, *supra*, 11 Cal.5th at p. 634.) Additionally, a parent's lack of progress in addressing the issues that led to dependency is not determinative. (*Id.* at p. 637.) A parent's inability to address the issues leading to dependency may be relevant in assessing whether the interaction between parent and child "has a 'negative effect' on the child." (*Ibid.*) Performing this analysis is a "subtle enterprise." (*Id.* at p. 634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship, which must be weighed against the benefits of a new adoptive home." (*Ibid.*)

We review the juvenile court's findings as to whether the parent has maintained regular visitation and contact with the child, as well as the existence of a beneficial parent-child relationship, for substantial evidence. (*Caden C.*, *supra*, 11 Cal.5th at pp. 639-640.) We do " 'not reweigh the

evidence, evaluate the credibility of witnesses, or resolve evidentiary conflicts' " and will uphold the juvenile court's determinations even where substantial evidence to the contrary also exists.  (*Id*. at p. 640.)

"[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his parent—is discretionary and properly reviewed for abuse of discretion."  (*Caden C.*, *supra*, 11 Cal.5th at p. 640.)  A court abuses its discretion by making " ' " 'an arbitrary, capricious, or patently absurd determination.' " ' " (*Id*. at p. 641.)

The *Caden C.* court explained, " 'there likely will be no practical difference in application of the two standards,' " but "[a]t its core, the hybrid standard . . . simply embodies the principle that '[t]he statutory scheme does not authorize a reviewing court to substitute its own judgment as to what is in the child's best interests for the trial court's determination in that regard, reached pursuant to the statutory scheme's comprehensive and controlling provisions.' " (*Caden C.*, *supra*, 11 Cal.5th at p. 641.)

B.    *Analysis.*

1.    Visitation.

In this case, the court determined that the regular visitation and contact prong was met.

2.    Beneficial Relationship.

Looking at the second element, to determine whether the child would benefit from continuing his relationship with the parents, the court observed that it needed to consider the "nature and contours" of the relationship.  The court stated, "What gives contour and shape to the relationship are things like the age of the child, how much [of] the child's life has been spent in the

20

parents' custody, the positive or negative effect of the interaction between the parent and child, and the child's particular needs."

The court found Dr. Stanton's comments credible, but it determined that the image of the relationship that emerged was one where the child had a fun and caring relationship with people he visited regularly. After the visits, he transitioned back to his normal routine seamlessly. The court acknowledged that different inferences could be drawn from how a child reacts after a visit. Outside of the visits, the court found no evidence that the parents occupied "space in the child's head." The court determined the relationship was beneficial and positive, but at the "lower end of substantial."

Contrary to Mother's contention, the court's comments do not suggest that it intertwined the second and third prong. We agree there is some evidence that Mother did "occupy space" in J.B.'s head at some points during the case, as evidenced by the fact that he asked to see pictures of her on at least one occasion. But any error in this regard was harmless because the court went on to find that a beneficial relationship existed, just "at the lower end of substantial."

We conclude there is substantial evidence to support the court's finding. "[T]he beneficial relationship exception demands something more than the incidental benefit a child gains from any amount of positive contact with her natural parent. (*In re Dakota H.* (2005) 132 Cal.App.4th 212, 229 [a parent must demonstrate something 'more than frequent and loving contact, an emotional bond with the child, or pleasant visits' ")]; *In re Angel B.* (2002) 97 Cal.App.4th 454, 468 ["for the exception to apply, the emotional attachment between the child and parent must be that of parent and child rather than one of being a friendly visitor or friendly nonparent relative, such as an aunt"].) The exception requires the existence " ' "of a substantial,

21

positive emotional attachment" ' between parent and child." (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 319, citing *Caden C.*, *supra*, 11 Cal.5th at p. 633, and quoting *Autumn H.*, *supra*, 27 Cal.4th at p. 575.) The record shows that J.B. enjoyed his visits with the parents, was excited to see them, and that they interacted appropriately. However, the record also shows that he did not spontaneously talk about the parents. He separated easily from them at the end of visits and he was not typically upset when visits did not occur. There was also evidence that he had other, perhaps more significant, attachments to the caregivers with whom he lived for most of his life.

### 3. Detriment.

Moving to the third element, the court analyzed whether any harm from severing the relationship with the parents outweighed the benefit of adoption. The court emphasized that it was not looking at whether the parents had a "parental role," but rather whether "the relationship with a parent is so important to the child that the security and stability of a new home would [not] outweigh its loss." The court determined that there was no evidence of such a relationship in this case. The court determined that "a child who is this young who spent most of his time outside of the parents' care will be able to find in the security and stability of a new home the comfort that will make the termination of parental loss something that is a distant memory." The court commented that there would be some residual effects in the short term if the parents are not able to visit because the visits were part of the routine, similar to visiting a friend or relative once a week. The court believed the parents loved J.B. and perhaps needed him. However, it did not find that J.B. needed them to the point that it would be detrimental.

22

The parents did not meet their burden of showing that any detriment J.B. might endure from the termination of his relationship with Mother and Father outweighed the stability he would enjoy in an adoptive home. (*Caden C., supra,* 11 Cal.5th at p. 636.) Dr. Stanton could not opine about whether J.B. would suffer any immediate detriment from the termination of his relationship with the parents. She was not asked to opine about whether adoption or guardianship were the best permanent plan for J.B. She would not say "for sure" whether or not the benefits of a stable adoptive home would overcome any "ambiguous loss" he might feel later in life from the termination of parental rights, or vice versa.

We recognize that continued parental struggles with the issues leading to dependency is not a bar to application of the beneficial parent-child exception. However, such issues may be relevant to the detriment analysis because they may "speak to the benefit (or lack thereof) of continuing the relationship" with the child. (*Caden C., supra,* 11 Cal.5th at pp. 637-638.) In this case, we note that the parents' longstanding on-and-off relationship has been punctuated with incidents of domestic violence that included not only the two incidents that led to dependency, but also an incident in March 2020 where Father was banging on the door of Mother's residence and an incident in June 2021 when Mother suffered a bite during an incident with Father. These incidents continued even though the parents both participated in domestic violence counseling services. Dr. Stanton commented that J.B.'s behavioral changes after visits could be a reflection of the fact that he was a child in the midst of conflict. It is reasonable to conclude that the conflict in the parents' relationship could infect the quality of their relationship with J.B. The court could reasonably conclude that the benefits of stability offered

23

to J.B. by adoption would outweigh the benefits of continuing his relationship with the parents.

Viewing the evidence in the light most favorable to the juvenile court's order (*Caden C.*, *supra*, 11 Cal.5th at p. 640), as we must, we conclude substantial evidence supported the court's factual findings and the juvenile court did not abuse its discretion in declining to apply the parental-benefit exception to adoption.

## II. Mother's Section 388 Petition

Mother contends the court erred in denying her request for expanded and unsupervised visitation based on changed circumstances. We disagree.

Under section 388, any parent or person with an interest in a dependent "may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The petitioner bears the burden of proving, by a preponderance of the evidence, two elements: (1) there is new evidence or a substantial change of circumstances; and (2) the proposed modification would be in the child's best interests. (Cal. Rules of Court, rule 5.570(e); *In re J.M.* (2020) 50 Cal.App.5th 833, 845.) We review an order on a section 388 petition for abuse of discretion. (*In re I.B.* (2020) 53 Cal.App.5th 133, 152-153.) " ' "The appropriate test for abuse of discretion is whether the [juvenile] court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the [juvenile] court." ' " (*Id.* at p. 153.)

Here, the court considered both whether there were changed circumstances and the best interests of the child. The court acknowledged that Mother made efforts to improve her circumstances a couple of months

after reunification services ended in April 2021. The court noted that this case, which involved a child under the age of three when it commenced, had been going on since 2018 and far exceeded the statutory time periods for such a case. Mother had ups and downs throughout the case, including periods where she was granted overnight visits but those were reverted based on lack of sobriety. The court commented that it could not be assured that they were not "just in the middle of that same changing circumstance, but rather at the end of that road." The court continued to have concerns that Mother continued having contact with Father. The court was also concerned that Mother had not disclosed to her therapist what the case involved and, therefore, was not fully confronting the issues that precipitated the case.

Considering the best interests of the child for unsupervised visits, the court expressed concern about whether Father would be present or the stepgrandfather, who had some criminal background. Assuming there were changed circumstances, which the court questioned, it found it was not in the best interests of the child to lift supervision.

We conclude the court did not abuse its discretion. With respect to the first element, "[t]he change of circumstances or new evidence 'must be of such significant nature that it requires a setting aside or modification of the challenged prior order.' " (*In re Mickel O.* (2011) 197 Cal.App.4th 586, 615; see *In re N.F.* (2021) 68 Cal.App.5th 112, 120 ["The change in circumstances supporting a section 388 petition must be material."]; *In re Ernesto R.* (2014) 230 Cal.App.4th 219, 223 ["To support a section 388 petition, the change in circumstances must be substantial."].) Mother's recent efforts here were commendable. Mother finally completed a co-parenting class that had been required under her case plan for some time. She self-attested to attending narcotics anonymous support meeting and submitted a negative drug test,

both of which were previously required by her case plan. In addition, she had obtained employment. However, after more than two years of reunification services, it was unclear how significant these changes were after other periods when she distanced herself from Father and achieved sobriety only to relapse.

With regard to the second element, after reunification services have terminated, "the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point 'the focus shifts to the needs of the child for permanency and stability . . . .' " (*In re Stephanie M.* (1994) 7 Cal.4th 295, 317.) Further, circumstances that are merely *changing* (as opposed to *changed*) can result in a delay in the selection of a permanent home, meaning they do " 'not promote stability for the child or the child's best interests.' " (*In re Mary G.* (2007) 151 Cal.App.4th 184, 206; accord *In re J.C.* (2014) 226 Cal.App.4th 503, 527 [the child's "best interests are not to further delay permanency and stability in favor of rewarding Mother for her hard work and efforts to reunify."].) As the court observed, it appeared Mother's efforts represented changing, rather than changed, circumstances. We cannot conclude the juvenile court abused its discretion in determining that it was not in J.B.'s best interests to delay permanency by either placing J.B. with Mother or lifting the supervision requirement considering these changing circumstances.

### III. ICWA Inquiry

The parents contend the Agency and the court failed to comply with the burden of initial inquiry required by ICWA. We agree.

Congress enacted ICWA to address concerns regarding the separation of Native American children from their tribes through adoption or foster care placement. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7 (*Isaiah W.*).) Under

California law adopted pursuant to ICWA, the juvenile court and the Agency have an " 'affirmative and continuing duty to inquire" whether a child "is or may be an Indian child." (§ 224.2, subd. (a); *Isaiah W.*, at p. 9.)

"[S]ection 224.2 creates three distinct duties regarding ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to *believe*' the child is an Indian child, then the Agency 'shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone 'knows or has reason to know that the child is an Indian child']; *id.*, subd. (d) [defining circumstances that establish a 'reason to know' a child is an Indian child]; § 224.3 [ICWA notice is required if there is a 'reason to know' a child is an Indian child as defined under § 224.2, subd. (d)].)" (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052 (*D.S.*).)

The first stage of initial inquiry " 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " (*D.S., supra,* 46 Cal.App.5th at p. 1049.) ICWA defines " 'extended family member' " by "the law or custom of the Indian child's tribe" or, absent such law or custom, as "a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-

27

law or sister-in-law, niece or nephew, first or second cousin, or stepparent."
(25 U.S.C. § 1903(2); § 224.1, subd. (c) [extended family member "defined as
provided in [§] 1903" of ICWA].)

In this case, the parents denied having Native American heritage early
in the case. At the jurisdiction and disposition hearing in December 2018,
the court found ICWA does not apply after Father's counsel confirmed that he
denied Native American ancestry.

However, maternal grandmother, maternal stepgrandfather, paternal
grandmother, paternal grandfather, and a paternal aunt were all in contact
with the Agency throughout the case. Maternal grandmother attended
numerous hearings. Maternal stepgrandfather and paternal grandmother
also attended hearings. The Agency interviewed and assessed resource
family approval applications from maternal grandmother, maternal
stepgrandfather, and the paternal aunt for potential placement. The record
gives no indication that the Agency or the court asked any of these
individuals about Native American ancestry.

Asking extended family members is not only required (§ 224.2, subd.
(b)), but it also serves a meaningful purpose—"to obtain information the
parent may not have." (*In re Y.W.* (2021) 70 Cal.App.5th 542, 556; see *In re
T.G.* (2020) 58 Cal.App.5th 275, 295 ["General information from the family
about its ancestry frequently provides the only available basis to believe an
Indian child may be involved."]; *In re Rylei S.* (2022) 81 Cal.App.5th 309, 322
[" 'When parents are the sole target of the initial inquiry, it should be
understood that there are a variety of reasons why relying on the parents
does not necessarily protect the child's best interests, or the rights of the
tribe. Parents may simply not have that information, or may possess only
vague or ambiguous information. [¶] The parents or Indian custodian may

be fearful to self-identify, and social workers are ill-equipped to overcome that by explaining the rights a parent or Indian custodian has under the law. Parents may even wish to avoid the tribe's participation or assumption of jurisdiction,' " citing Cal. ICWA Compliance Task Force, Rep. to Cal. Atty. Gen.'s Bur. of Children's Justice (2017) p. 28].) Nor are we asking the Agency to " 'cast about' for investigative leads." (*In re A.M.* (2020) 47 Cal.App.5th 303, 323.) Each of these individuals were readily available to the Agency and the court.

We conclude the error in failing to complete the initial inquiry was prejudicial and a limited remand is necessary. We recognize there is a split of authority as to the proper standard for assessing prejudicial error under ICWA. (See, e.g., *In re Dezi C.* (2022) 79 Cal.App.5th 769, 777-779.) We need not and do not take a position on that standard here, because the initial ICWA inquiry was clearly inadequate as to multiple family members. The Agency sought an ICWA finding when inquiry had just begun, and the juvenile court did not take advantage of multiple opportunities at hearings to ask the relatives about Native American heritage. These efforts were a fundamental departure from the " 'affirmative and continuing duty to inquire' " under ICWA, and resulted in a miscarriage of justice. (*Isaiah W.*, *supra*, 1 Cal.5th at p. 9; Cal. Const., art. VI, § 13.)

DISPOSITION

The March 3, 2022 order is conditionally reversed. The matter is remanded to the juvenile court with directions to comply with the inquiry provisions of ICWA and section 224.2. If, after completing ICWA inquiry, neither the Agency nor the juvenile court has reason to know that J.B. is an Indian child, the court shall reinstate the findings and orders previously entered on March 3, 2022. If, after an adequate inquiry, the Agency or

29

juvenile court has reason to know E.M. is an Indian child, the juvenile court shall proceed accordingly.


HALLER, Acting P. J.

WE CONCUR:


O'ROURKE, J.


AARON, J.